| | |
|---|---|
| John Weninger, on behalf of himself and all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>General Mills Operations, LLC,<br><br>　　　　　Defendant | Case No. 18-cv-321 |

**DEFENDANT'S PROPOSED FINDINGS OF FACT IN SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION AND IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant General Mills Operations, LLC ("Defendant" or "General Mills), by and through its undersigned counsel, and pursuant to Civil Local Rule 56(b)(1)(C), submits the following proposed findings of fact in support of its opposition to Plaintiff's motion for conditional certification and in support of its motion for summary judgment.

**I.　General Mills Operates Numerous Production Facilities Throughout the United States; Some of Which Have Hourly Incentive Programs That Pay Wage Incentive Bonuses to Non-Exempt Employees.**

1.　General Mills operates approximately 27 facilities in the United States part of the production process of a wide variety of food products ("Production Facilities"). (Declaration of Ella Jaehnig ("Jaehnig Decl.") ¶ 1.)

2.　While each Production Facility plays a role in the production process generally, many of them function and operate differently from one another. (*See* Declaration of Shanthi Gaur ("Gaur Decl.") ¶ 2, Ex. A, Deposition of Nicole Vachon ("Vachon Dep.") 20:12-22.)

3. For example, some Production Facilities are milling facilities which grind or crush wheat into flour for flour-containing products. (Gaur Decl. ¶ 2, Ex. A, Vachon Dep. 20:12-24:13.)

4. Some Production Facilities are more directly involved in packaging and shipping products worldwide. (*Id.*)

5. In addition to their varied purposes, Production Facilities also vary as to their workforces. (Declaration of Chris Julian ("Julian Decl.") ¶ 2.)

6. Some Production Facilities have a unionized workforce covered by a Collective Bargaining Agreement. (*Id.*)

7. Some Production Facilities are large, while others may have smaller workforces of less than 15 people. (*Id.*)

**II. Some, But Not All, General Mills Production Facilities Have Hourly Incentive Programs That Pay Wage Incentive Bonuses to Non-Exempt Production Employees.**

8. From March 2, 2015 through March 2, 2018, some General Mills Production Facilities adopted Hourly Incentive Programs. (Jaehnig Decl. ¶ 3.)

9. As part of these Hourly Incentive Programs, Production Facilities could choose to pay biannual bonuses to their non-exempt production employees ("Wage Incentive Bonuses"). (*Id.*)

10. From March 2, 2015 through May 31, 2017, General Mills did not have a uniform Hourly Incentive Policy across all facilities; instead, the policies varied by location. (Gaur Decl. ¶ 2, Ex. A, Vachon Dep., 15:16-22; 16:8-24.)

11. After May 31, 2017, General Mills changed the bonus plans across its sites; however, Plaintiff was not employed at this time and thus did not receive any bonus under the new plan. (Jaehnig Decl. ¶ 4).

12. Not all hourly, non-exempt production employees in the United States received Wage Incentive Bonuses for various reasons, including (1) some Production Facilities did not adopt any hourly incentive policy or chose not to offer one during a given year; (2) some Production Facilities have unionized workforces whose pay is determined by a Collective Bargaining Agreement; (3) some Production Facilities were closed down during various times from March 2, 2015 to March 2, 2018. (Gaur Decl. ¶ 2, Ex. A, Vachon Dep. 47:4-51:11).

13. For example, non-exempt production employees in three Production Facilities – Buffalo, New York; Cincinnati, Ohio; and Martel, Ohio – did not receive a Wage Incentive Bonus from March 2, 2015 to March 2, 2018 because the Production Facility did not adopt an Hourly Incentive Plan. (Jaehnig Decl. ¶ 6.)

14. Likewise, the Buffalo, New York Mill did not use an Hourly Incentive Plan in fiscal year 2015 or 2018. (*Id.*)

15. Similarly, the Production Facility in West Chicago, Illinois did not have an Hourly Incentive Plan in 2016, 2017 or 2018. (*Id.*)

16. Finally, the Lodi, California; Methuen, Massachusetts, New Albany, Indiana; and Vineland, New Jersey plants closed during fiscal year 2017 and thus did not use the wage incentive program during that year. (*Id.*)

17. Likewise, even in those facilities where a Wage Incentive Bonus was paid during the relevant time period, the facilities adopted different Hourly Incentive Programs with different factors and considerations – there is not one standard program that addresses the payment of bonuses to all non-exempt production employees nationwide during the relevant time period. (Gaur Decl. ¶ 2, Ex. A, Vachon Dep. 15:16-16:24).

18. Instead, the programs were administered locally, whereby each Production Facility decided on its own whether it would pay a Wage Incentive Bonus. (Gaur Decl. ¶ 2, Ex. A, Vachon Dep. 61:2-66:1.)

19. To the extent Wage Incentive Bonuses were paid from May 2, 2015 through May 31, 2017, each General Mills production facility used different formulas and based the bonuses on different criteria. (Gaur Decl. ¶ 2, Ex. A, Vachon Dep. 63:2-64:19; Jaehnig Decl. ¶4).

20. On a broad level, the local, site-specific plans considered eligible earnings, which included any overtime earnings, multiplied by a percentage multiplier, along with various other site-specific criteria, (Gaur Decl. ¶ 2, Ex. A, Vachon Dep. 63:2-64:19), or offered a lump sum bonus payout, which was then recalculated into the regular rate for overtime purposes. (Jaehnig Decl. ¶ 7.)

**III. General Mills' Milwaukee Production Facility Has Its Own Hourly Incentive Program.**

21. From March 2, 2015 to May 31, 2017, the Milwaukee Production Facility where Plaintiff worked used the Milwaukee "Hourly Incentive Program ("HIP")" to award biannual Wage Incentive Bonuses to its non-exempt production employees. (Jaehnig Decl. ¶ 9, Ex. A.)

22. Thereafter, the Milwaukee Production Facility changed its plan, but Plaintiff was not employed at this time and thus did not receive any bonus under the new plan. (*Id.*)

23. The Milwaukee Wage Incentive Bonus is not a lump sum, but rather an amount obtained by considering an employee's eligible earnings along with various other factors including the facility's performance, the employee's individual performance, and other ratings including plant and cell ratings. (Jaehnig Decl. ¶ 8).

24. Individual ratings were determined through the performance appraisal process, which assesses individual accomplishments against goals and objectives for the year and demonstrated behaviors. (*Id.*)

25. These factors are all considered in order to obtain a standard multiplier. (*Id.*)

26. This multiplier is then applied to an employee's "eligible earnings." (Jaehnig Decl. ¶ 8; Gaur Decl. ¶ 2, Ex. A, Vachon Dep. 53:16-54:16.)

27. An employee's "eligible earnings" include both straight time and overtime pay. (*Id.*; Gaur Decl. ¶ 3, Ex. B, Deposition of Chris Julian ("Julian Dep.") 102:2-102:9.)

28. "Eligible earnings" also include holiday pay. (Jaehnig Decl. ¶ 8.)

29. Because of General Mills' fiscal year, which runs from June 1 through May 31, it issues a mid-year check in late December based on earnings from June through November. (Jaehnig Decl. ¶ 10.)

30. Then, it issues a year-end check at the end of the fiscal year in July. (*Id.*)

31. Pursuant to the Milwaukee HIP, after six months, an employee receives a Mid-Year Wage Incentive Bonus payment based on a standard 2.5% multiplier, a 1.2 average individual rating, year-to-date cell and plant performance and the employee's total earnings during the first six months of the fiscal year. (Jaehnig Decl. ¶ 10.)

32. In June, at the end of the fiscal year, an employee's total earnings are multiplied by the standard 2.5% and then by cell, plant, and individual performance. (*Id.*)

33. As was true with the December payment, earnings for the June payment include both straight time and overtime pay before taxes. (*Id.*)

34. This payment is paid in early July and is based on earnings from the entire fiscal year. (*Id.*)

5

35. The December mid-year payment is then subtracted from the June payout to determine the final incentive payment for the year. (*Id.*)

36. Under the Milwaukee HIP, the formula to calculate a Wage Incentive Bonus is:

**TOTAL EARNINGS (INCL. STRAIGHT TIME AND OVERTIME) *X* 2.5% *X* PLANT RATING**

***X* CELL RATING *X* INDIV. RATING**

(Jaehnig Decl. ¶ 12.)

37. So, for example, if an employee earns $40,000 a year (including all straight time and overtime earnings) a Mid-Year Wage Incentive Bonus payment would be calculated as follows:

> $20,000 Total Earnings *x* 2.5% Multiplier *x* 1.4 Plant Rating *x* 1.2 Cell Rating *x* 1.2 Average Individual Rating = $1,008 Mid-Year Wage Incentive Bonus Payment.

(*Id.*)

38. The Milwaukee plant used the 1.2 performance rating as a placeholder to signify an average rating at midyear because annual ratings were not completed by this time. (*Id.*)

39. That employee's Annual Wage Incentive Bonus would be calculated as follows:

> $40,000 Total Earnings *x* 2.5% Multiplier *x* 1.8 Plant Rating *x* 1.48 Cell Rating *x* 1.3 Individual Rating = $3,463 Annual Wage Incentive Bonus Payment.

(*Id.*)

40. Then, because that employee has already received $1,008 of their Annual Wage Incentive Bonus, that amount is subtracted from the total, and the employee is paid $2,455 (i.e., $3,463-$1,008). (*Id.*)

**IV. Plaintiff Received Wage Incentive Bonuses Consistent with the Milwaukee HIP.**

41. Plaintiff, John Weninger, was a non-exempt Training Coordinator at the Milwaukee Production Facility. (Gaur Decl. ¶ 2, Ex. A, Vachon Dep. 29:15.)

42. Training Coordinators are responsible for training processes that help employees develop technical mastery and overall employee growth, ultimately improving individual and organizational performance at the Milwaukee Production Facility. (Julian Decl., ¶ 4, Ex. A.)

43. As a non-exempt production employee, Plaintiff was paid an hourly rate of pay and also received certain incentive pay, including a Wage Incentive Bonus pursuant to the Milwaukee HIP. (Dkt. 8, Answer, ¶ 50).

44. In his Motion, Plaintiff admits that his Wage Incentive Bonus was paid by using a formula that was both unique to the Milwaukee Production Facility and was a percentage of his total earnings. (Dkt. 19, Declaration of John Weninger ¶ 8).

45. Plaintiff correctly notes: "The formula, as I understood it, was calculated by <u>multiplying my year-to-date earnings, including regular and overtime pay, by our Milwaukee, Wisconsin plant's performance rating, our cell's performance rating, and my own personal performance rating</u>." (*Id.*)

46. Under the Milwaukee HIP, in 2015, Plaintiff received a $2,179.93 Annual Wage Incentive Bonus, and in 2016 he received a $3,209.92 Annual Wage Incentive Bonus, paid out biannually in the following incentive payments during the relevant time period:

| July 2015 | $1,290.27 |
| December 2015 | $889.66 |
| July 2016 | $1,748.54 |
| December 2016 | $1,461.38 |

(*See* Dkt. 19, Weninger Decl., Exs. A and B.)

47. Plaintiff's Wage Incentive Bonuses were calculated consistent with the Milwaukee HIP as follows:

**(a) FY2015**

- $19,541.16 Total Earnings *x* 2.5% *x* 1.3 Plant Rating *x* 1.103 Cell Rating *x* 1.2 Individual Rating = $840.60 Mid-Year Wage Incentive Bonus Payment

- $48,191.41 Total Earnings *x* 2.5% *x* 1.45 Plant Rating *x* 1.22 Cell Rating *x* 1.0 Individual Rating = $2,130.87 Annual Wage Incentive Bonus Payment

- $2,130.87 (Annual) - $840.60 (Mid-Year Wage Incentive Bonus Payment) = $1,290.27

**(b) FY2016**

- $27,475.43 Total Earning *x* 2.5% *x* 1.25 Plant Rating *x* 0.91 Cell Rating *x* 1.2 Individual Rating = $889.66 Mid-Year Wage Incentive Bonus Payment

- $58,939.16 Total Earnings *x* 2.5% *x* 1.45 Plant Rating *x* 1.18 Cell rating *x* 1.05 Actual Individual Rating = $2,638.21 Annual Wage Incentive Bonus Payment

- $2,1638.21 (Annual) - $889.66 (Mid-Year Wage Incentive Bonus Payment) = $1,748.54

**(c) FY2017**

- $31,408.82 Total Earnings *x* 2.5% *x* 1.11 Plant Rating *x* 1.40 Cell Rating *x* 1.2 Average Individual Rating = $1,461.38

(Jaehnig Decl. ¶ 16.)

48. Plaintiff's Wage Incentive Bonus payments applied the percentage multiplier to Plaintiff's Total Earnings, which included his straight time and overtime earnings. (Jaehnig Decl. ¶ 16.)

49. As of February 2015, there were approximately 7,200 non-exempt Production employees at production facilities in the United States that offered a wage incentive bonus as part of General Mills' Hourly Incentive Programs. (Jaehnig Decl. ¶ 17.)

Dated: July 13, 2018

      *s/Shanthi V. Gaur*
Sofija Anderson (WI SBN: 1041498)
**LITTLER MENDELSON, P.C.**
111 East Kilbourn Avenue; Suite 1000
Milwaukee, WI 53202
Telephone: 414.291.5536
Facsimile: 414.291.5526
E-mail: sanderson@littler.com

Shanthi V. Gaur (SBN: 06224996)
**LITTLER MENDELSON, P.C.**
321 North Clark Street; Suite 1000
Chicago, IL 60654
Telephone: 312.372.5520
Facsimile: 312.372.7880
E-mail: sgaur@littler.com

**ATTORNEYS FOR DEFENDANT**